Good morning, and welcome to the Ninth Circuit, and also welcome to our visiting students. The first case for argument today, and you may be seated, is Juvencio Angon-Paz v. Barr. And you may proceed. Good morning, Your Honors. May it please the court, my name is Aaron Kiesler. I represent the petitioner, Juvencio Angon-Paz. I would like to reserve two minutes for rebuttal, if I may. All right. Your Honor, this case is about whether a reasonable officer would know that using an administrative search warrant for a business could be bootstrapped to allow entry without consent into a private residence. And whether that, and if that is a constitutional violation, which I believe it is. And then secondly, whether a subsequent encounter following that entry, whether the government can show that that subsequent encounter and the information obtained there was not the fruit of an initial constitutional violation. Let's suppose that we conclude that the entry at his residence was unwarranted and violative of his rights. Didn't he go, I think it was to the post office? Yes. Didn't he go voluntarily? No, Your Honor. Well, explain that. He was told that if he didn't cooperate with the officers at the initial encounter at the home, that there was going to be problems. He was told that he had to. He was told that they were coming into his house, whether he liked it or not. I know you're not asking about the home entry, but that is important to keep in mind. He was later called by the ICE officer and told that he had to go to the post office. So he goes to the post office, and that's where the discussion happens and ICE obtains allegiance. I'm sorry, where is it in the record that the agent called him to tell him to go to the post office? I don't have that site. I don't have that site in front of me. But your case hinges on that, does it not? Right. I could provide that citation. Well, counsel, the government has cited, I'm not sure why in a rule 28 letter, but the government has cited New York versus Harris. And the facts in New York versus Harris were, I think, even if you're right, that there was a constitutional violation. And the Supreme Court said the statement, the murder confession, should not be suppressed because that would be inconsistent with the Fourth Amendment. So in light of New York v. Harris, even if we find a constitutional violation, how can we rule that your client's statement should be suppressed? How do you distinguish New York v. Harris? Orhorage? Orhorage? I can't pronounce the name of the Nights Warrior case, O-R-H-O-R-A-G-H-E, it's a newer case. Facts are virtually identical, and the point is that when a person allows entry into their home because they're submitting to the authority of the government rather than voluntarily allowing them, when an officer claims an independent authority to enter that home, that entry is not consensual. Right. But in New York v. Harris, the Supreme Court assumed there was a very similar type of constitutional violation and there was a murder confession that followed shortly on the actual entry into the home. And the Supreme Court said that that confession shouldn't be suppressed because it wasn't come about by exploitation of the alleged illegality. So I mean, I would like you to explain how, since we're obviously bound by New York v. Harris, how we can rule that your client's statement in the post office can be suppressed. So the three-part test for attenuation, is that what you're asking me, Your Honor? Well, he asked you about a holding from the United States Supreme Court, and your initial response was to cite to a Ninth Circuit case. Sure, yes, Your Honor. So do you have some follow-on Supreme Court authority that says Harris was wrongly decided? No, I don't. And I'm not arguing that the United States Supreme Court wrongly decided the Harris case. It's just that the severity of the conduct in this case is such that, I know there's a temporal argument here, and then, of course, the presence of intervening circumstances. But the third prong is the flagrancy of the official misconduct. And I think that the conduct in this case was so severe that it's not attenuated sufficiently. And it is the prudent misconduct. Let me go through the chronology, just to make sure we're clear. So they bust Newtoy's home, and I'll give you, just for talking purposes, that that's a constitutional violation to do that without a warrant. So they said they would follow up. My understanding is they never did follow up. He called them. Okay, so that's quite a bit different than what you told us at the outset. So he said he would follow up in a week. They said they would. But he never heard back from them, correct? Well, and I have to find the pin site, Your Honor, in the 2,500-page record. But there is — so in the Petitioner's declaration, there is no mention of this phone call from the ICE agent. But the — it's in the — it's — I can find it. Well, but if that's central to your case, I would hope that might have been a citation. You know, we have that famous case about we're not pigs hunting truffles, and we've read the record. True. But — so I just want to get your chronology. They said they would follow up. They did not. There's a — Okay, let's stop there. They did not follow up. Is that true? I think there's a factual dispute about whether or not there was a phone call made. But you just told me that he made the phone call. No, no. There's a — the officer called him. Counsel, your brief says at page three, when two weeks passed without contact and Mr. Angan's phone number changed, he grew very nervous about what would happen if ICE agents could not contact him by phone. He felt impelled to present himself at a nearby post office where ICE agents were conducting follow-up interviews with his Sun Valley co-workers. That's at page two of your brief. Right. Yes, Your Honor. And that's based on the declaration. So you're now backing away from that. Well, I'm not backing away from it. There is evidence in the record that the ICE officer called him. You're sure about that? You're sure about that? Yes, Your Honor. Okay. And so, even if the ICE agent called him, is there anything in the record that required him to go to the post office, as opposed to the portion that Judge Bennett just read, which is he wanted to find out what was going on and he knew something was going on at the post office? I think so, Your Honor. I think that, again, it's important to remember the encounter that happened at his home. And I think that... No, we've been through that. We're trying to parse the intervening circumstances now. Right. Thank you, Your Honor. What was his status after the incident at the home? What is his immigration status? He has no immigration status. Okay. Wasn't a person, in his circumstance, obligated to inform the government of their current address? Yes, Your Honor. And this was a new address he was at? New phone number, Your Honor. Okay. New phone number. And so, he was doing, whether it was voluntary or not, he was doing what he was required by law to do, correct? Yes, Your Honor. But he wasn't required by law to go to the post office and do that. No, he wasn't. Normally, in the immigration context, changing addresses is a problem because then individuals can't receive the notice. That's right. So, there's a form and they make a filing with the immigration authorities, I changed my address. Yes, Your Honor. But that's not implicated here, right? No, I don't believe so. And he didn't try to file some form? No, Your Honor. So, I guess I'm still having some trouble understanding how it is. You know, he knew some of the, people knew something was going on at the post office. I'm having trouble understanding how it is the chain of events was not completely broken by his voluntarily going to the post office. Again, because I think the point is that he was told that he had to comply or there would be problems at the house. I know I'm going back to the house. He was told that at the house, correct? Right, right. But it's still in his mind, Your Honor. Well, but nobody, they didn't arrest him, correct? No. And they didn't send him a notice, come in? No. No. All right. You might want to reserve your rebuttal. Yes. Thank you. Maybe you can find that record citation and tell us on rebuttal. Good morning, Your Honor. May it please the Court. My name is Andrew McLaughlin, and I represent the Respondent Attorney General of the United States. The only question that this Court needs to address is whether or not the admissions that Petitioner seeks to, seeks to suppress, those admissions made at the post office, because there's no evidence of any admissions made anywhere else, were required to be, were required to be suppressed. But before I get to that point, there's a couple things that I need to mention right up front. First of all, in Petitioner's brief, he says that he is an alien and is unlawfully present. Well, if true, that moots the entire issue, because there's, he's conceded the case. I was going to tell you that the government can't accept his admission of unlawful presence because it's not true. The citation that he gives is to some other case, it's not to his own. But unfortunately, here in argument, Petitioner has also admitted that he was, that he's unlawfully present. There is no suppression issue if that's, with those admissions on the record. And that's amply demonstrated by Lopez-Mendoza and other cases. I just want to put that out there so the Court is aware of it. What's your understanding of what the record says about whether the agents called him and directed him to go to the post office? I saw things that suggested that in the briefing, but there is no record. You're talking about the record. There is no record evidence that I could find that indicates that agents called him or that he called them to change his phone number. It's mentioned in the briefing, but not in any of the evidence that I could find. And I looked at some of the other cases that are in this immense consolidated record, too, to try to find if that was a mistake citing some other case. I couldn't find it in any of the other cases. What I do know, however, is that this record is a little short on information because of what we – what the agency calls the matter of Barsanis process, this prima facie standard that results in no burden being on the government. That is, the alien's affidavit needs to establish something, and if it doesn't, you don't go any further. And that's the stage that this case got stopped at. So what you don't see is the employment records. You don't see the – any of the other information that you might expect to see in a record in a suppression case because that isn't the way the agency process works. So that does two things. First of all, it means that even if this Court were to find that the agency was entirely wrong and needs to send – wanted to send it back for that purpose, that means that it can't – termination is not an issue, and it would have to go back for the rest of the Barsanis process. But, counsel, if the government's view, as expressed in its brief, is that even if we assume for the sake of argument that there was a constitutional violation at the House, there's no evidence that ought to be suppressed, and so the petition should be denied. That is correct, Your Honor. And I think that's – if you – you don't really need to get past Wong Son at all for that purpose. Wong Son was a case of a midnight warrantless entry into a home and an arrest in a home after which he made admissions, and then he was released on his own recognizance, and they made – they said, why don't you come back in three days and we'll talk some more. And he came back in three days and they talked some more, and those admissions were found to be admissible under those – under the circumstances. So I can't see any way around Wong Son, not to mention all of the other cases. What's the petitioner's detention status, if you know? I do not believe the petitioner is currently detained. It's been a long time, Your Honor, this case. That's fine. This case was – went to an immigration court in 2009, and the events took place in 2008. Okay. As far as I know, he has not been detained again. I checked a few months ago, but I haven't – I haven't rechecked that. The final thing I want to talk about is this chronology that we started with. Remember that what this record does demonstrate is that there was an I-9 audit. There was an audit of employment records back in June, I think it was, which is when they confirmed that he, in fact, was employed there. That's what the documents show. And they found – what they found was an I-9, which is evidence of alien image by itself, in his name, but it was supported by a – apparently, according to the record, was supported by a green card that had somebody else's A number on it. It was a fake green card, and that's why they were looking for him. That in itself would be sufficient evidence to – for removal. So these officers, as you can see throughout the record, if you look at all of the affidavits, including Petitioner's, these officers were looking for evidence that the business was doing this as an organized process. They weren't looking for evidence about this guy. They already had it, and that's what they told him at the door. Even his own affidavit says that. Instead, they said – But that's not a great argument when they kind of bust in. Well – You have to admit. Honestly, Your Honor, if you look at all of the affidavits, they say basically they have all the same elements to them. That is, there's some yelling going on. There's some insisting that you tell us the truth, and that's, you know, kind of intimidating. There's no doubt about that. And in this case, he has this allegation that we're going to come in whether you like it or not. I'm not sure that's what exactly was said, given what we can see throughout the record. Well, but we – but for the purposes here, we have to take his affidavit as true. Right. But you have to look to see what's missing. That's what these cases are all about. If the alien is clearly leaving something out, that would undercut his own case. So what happened here is they came to the door. They said, look, magistrate found probable cause that you're unlawfully present in the United States. You had better talk to us, or we are going to detain you, and we're going to take you back, and we're going to question you about this. We can do this here in your house quietly, or we can do it somewhere else. That's what I read into this record. And that's what you see throughout the record of all of the other cases. And Petitioner concedes that he was, in fact, talking to his coworkers about what happened when they were stopped at the workplace. So imagine, if Petitioner here had been stopped at the workplace, would he have made those admissions? And this is where Harris comes in. If he would have made the exact same admissions had he been stopped based on that warrant at the workplace, we're not dealing with fruit of the poisonous tree at all. And that's kind of what – that's what the Harris – that's why I felt obliged to add Harris. And I was a little surprised to see that it wasn't in our brief, that we'd left out that stage of the reasoning. So instead of having this absence of consent simply by saying they yelled at me a lot, so I stepped back out of the way and let them into my house, and then they yelled at me some more, and I answered their questions about my employer, instead of – what this case is really about is if you look at the other affidavits in the case, if you have – this panel has three of the other cases in front of it submitted, or that are going to be submitted, you will see there that there's references to the officers saying, look, we're after your employer. If you help us, we might give you work authorization. I didn't make any promises. But they referenced this possibility. So if the question is, did he really consent to the entry of his house, the answer is, yes. He had been talking to his coworkers, and they were telling him, this is what – this is what's going on. And when he didn't hear back from them and didn't see that possibility of work authorization materializing – this is all my supposition based on what I read into this record – but this is what the immigration judge was faced with. The immigration judge saw that and saw that these massive gaps were left in his affidavit. So to your knowledge, is there any record evidence that shows he was told to come into the post office? There is no such record evidence. If there's nothing further, I would submit on the briefs. No, nothing further. Thank you. You have some rebuttal time. Thank you. Your Honor, page 1,642 of the administrative record is an I-213 form submitted by Special Agent Cook. An I-213 is essentially a police report or a report of an encounter that leads to an immigration arrest. Bencio Aguinaldo Paz was encountered when he presented himself – when he presented himself to agents at the H-Street in Eureka based on a follow-up phone call from S.A. Cook, Special Agent Cook. The – so he did receive an intervening phone call. The government never offered Agent Cook or anyone to testify to support, you know, whether or not this was a 10-year-old. Remember, it's the government's burden. Is this record cited anywhere in your brief? No, Your Honor. And he didn't ever put that in his declaration, is that right? He did not. I think your time has expired unless there's further questions. Thank you, Your Honor. Thank you. The case just argued, Angon Paz v. Barr, is submitted. We have some related circumstances cases also submitted. Silva, Angon, Romero Yanez, and Luvano Benitez v. Barr are submitted. Blue Lake Rancheria is submitted pending mediation, and Nevada v. United States is submitted on the briefs. So with that, we'll adjourn for this morning. Thank both of you for your argument this morning. We're adjourned.
judges: Hawkins, McKeown, Bennet